24-1025-cr
*United States v. Pence*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2025

(Argued: October 29, 2025    Decided: April 10, 2026)

Docket No. 24-1025-cr

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

CHRISTOPHER PENCE,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

Before:            CABRANES, CHIN, and ROBINSON, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the

Northern District of New York (Hurd, *J.*), convicting defendant-appellant of use

of a facility of interstate commerce in connection with murder-for-hire.  After an

evidentiary hearing, the district court denied defendant-appellant's motion to

suppress statements he made to law enforcement before being given *Miranda*

warnings.  The district court held that the Government established by a preponderance of the evidence that defendant-appellant was not in custody when he confessed to taking part in a murder-for-hire scheme.  We agree, and affirm the judgment of the district court.

AFFIRMED.

_____

MICHAEL F. PERRY, Assistant United States Attorney, *for* John A. Sarcone III, Acting United States Attorney for the Northern District of New York, Syracuse, NY, *for Appellee*.

SUSAN C. WOLFE, Law Office of Susan C. Wolfe, Riverdale, NY, *for Defendant-Appellant*.

_____

CHIN, *Circuit Judge*:

In this case, defendant-appellant Christopher Pence appeals from his conviction for use of a facility of interstate commerce in connection with murder-for-hire.  Pence contends that the district court (Hurd, *J.*) erred by denying his motion to suppress statements he made while being interrogated by law-enforcement agents before receiving *Miranda* warnings.  The district court held that a reasonable person in Pence's circumstances would not have believed he

- 2 -

was in custody.  For the reasons stated below, we AFFIRM the district court's decision.

## BACKGROUND

**I.     *The Facts***

The facts, which are largely undisputed, are drawn from the district court's findings of fact and evidence and materials in the record, including the presentence report.  On appeal, Pence does not argue that the district court erred in its factual findings.

### A.     *Events Leading to the Search Warrant*

In 2018 Pence and his wife (the "Pences"), the parents of eleven children, began caring for five children of Francesco and Christina Cordero (the "Corderos").  The Pences lived in Washington state at the time and the Corderos in Massachusetts.  In December 2019, the Pences adopted the five children, and the two families had an ongoing relationship so that the Corderos could see their children from time to time.  Both families relocated to Texas, but eventually the Pences relocated to Utah and the Corderos to Hoosick Falls, New York.  Thereafter, the Pences began limiting contact with the Corderos as their relationship deteriorated.  At some point, the Corderos asked the children if they

wanted to return to live with them.  The children reported the conversations to the Pences, who were upset that the Corderos were trying to get their children back.

In July 2021, Pence accessed the dark web and began communicating with a purported hitman.  Pence asked for the Corderos, who were living in Hoosick Falls at the time, to be murdered and for "it to look like an accident." Presentence Investigation Report at 5.  Pence provided the purported hitman with the Corderos' names, images, and address.  Pence eventually transferred $16,486.06 worth of Bitcoin to the purported hitman in furtherance of the murder-for-hire scheme.

In September 2021, the FBI learned that an IP address registered to Pence's Utah home was linked to negotiations for the murder of the Corderos. The FBI also traced back to Pence the Coinbase account used to transfer the Bitcoin in the murder-for-hire scheme to the purported hitman.  The FBI, however, was aware that three other adults living in Pence's home could have had access to the electronic devices used to arrange the hit and make the cryptocurrency payment.  Eventually, a Magistrate Judge signed a search warrant for Pence's Utah home.

**B.** *The Search*

On October 27, 2021, around 6:48 AM, approximately fourteen law-enforcement agents positioned themselves outside Pence's home to execute the search warrant. The agents, who had received information that Pence likely had a firearm at home, possessed a mix of pistols, long guns, shields, and sledgehammers or other breaching tools. Upon hearing a loud bang, Pence opened the door and was informed that the agents had a search warrant for his home. Agents then entered Pence's home with their guns in a low-ready position.[1] While entering, the agents asked Pence to stand outside his home for approximately five minutes while securing his house. They later instructed Pence to call for anyone in the house to come downstairs.

After the agents secured the home, Pence's family was kept in the living room while he was held in the foyer. An FBI agent asked Pence if he was "willing to speak with" agents either in the house or in their vehicle outside. Pence agreed to talk outside in the officer's vehicle and informed the agent that he first needed to retrieve his shoes from upstairs. Pence was then permitted to retrieve his shoes, although he was accompanied by agents. Uncuffed and under

---

[1] The "low-ready" position consists of agents having their weapon unholstered and positioned by their side at "a 30- to 45-degree angle." J. App'x at 50-51.

his own power, Pence walked outside, approached an FBI vehicle, opened the door himself, and entered the vehicle. Two FBI agents also entered the vehicle, where a recording device had already been turned on.[2] There were no other agents near the vehicle at that time.

Once inside the vehicle, the FBI agents informed Pence that he was not under arrest and did not have to answer any questions, but they did not give a *Miranda* warning at that time. An agent advised Pence:

> You are not under arrest, at all. That's not what we're doing. We're just -- we're here to talk. You're under no obligation to talk to us, we -- we would appreciate your help, okay? In -- in just trying to figure out -- 'cause obviously we're here for a reason, right?

J. App'x at 175.

The agents went on to question Pence for an hour and a half on basic topics in what they described as "rapport-building or small talk." *Id.* at 35. Once the small talk finished, the agents shared with Pence evidence they gathered from investigating the murder-for-hire scheme. After Pence was confronted with evidence for six minutes, he confessed to the murder-for-hire scheme. The

---

[2] While Pence was inside the FBI vehicle, his wife, parents, and children "went about their day" inside the home. J. App'x at 175.

agents never yelled at, threatened, or pointed a firearm at Pence, and he was never physically restrained while in the FBI vehicle or otherwise.

After this initial confession, Pence spent the next thirty minutes or more confirming the evidence and explaining why he attempted the murder-for-hire. Approximately two hours and ten minutes into the questioning, the agents advised Pence of his *Miranda* rights. Once advised of his rights, Pence signed a consent form and continued speaking with the agents.[3]

## II.   *Procedural History*

On November 9, 2021, a grand jury returned an indictment against Pence on one count of using a facility of interstate commerce in connection with murder-for-hire, in violation of 18 U.S.C. § 1958(a). Pence eventually moved to suppress the statements he made to the agents before he was read his *Miranda* rights. On June 8, 2023, in response to Pence's motion, the district court held an evidentiary hearing. Pence, his wife, both agents who questioned Pence, and one

---

[3] Pence has a bachelor's degree in finance and worked in the "tech industry" for more than twenty-five years, including owning and managing a computer store and working as a "Systems Engineer III" at Microsoft for eight years. *See Terry v. LeFevre*, 862 F.2d 409, 413 (2d Cir. 1988) (noting that when considering the voluntariness of a confession we consider, *inter alia*, the defendant's age, background, and intelligence); *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (same). Pence does not argue, independent of his contention that the officers improperly conducted a custodial interrogation without giving him *Miranda* warnings, that his confession was involuntary.

additional agent testified about the events in question. After the hearing, the district court directed the parties to submit proposed findings of fact and conclusions of law, and they did so.

By memorandum-decision and order dated October 18, 2023, the district court denied Pence's motion to suppress the pre-*Miranda* statements. The district court held that although Pence was not given *Miranda* warnings until after he confessed to the crime, the Government had shown, by a preponderance of the evidence, that Pence was not in custody at the time he made his statements.

After Pence entered a conditional plea of guilty to the one-count indictment, he was sentenced to seven years' imprisonment followed by three years of supervised release. This appeal followed.

## DISCUSSION

### I. Applicable Law

#### A. Standard of Review

"When reviewing a district court's ruling [denying] a motion to suppress evidence, we review the court's factual findings for clear error, viewing the evidence in the light most favorable to the government. The district court's

legal conclusions are reviewed *de novo*." *United States v. Worjloh*, 546 F.3d 104, 108 (2d Cir. 2008) (per curiam); *accord United States v. Rodriguez*, 356 F.3d 254, 257–58 (2d Cir. 2004).

### B.    Miranda

In light of the Fifth Amendment right against self-incrimination, law enforcement may not interrogate an individual "taken into custody or otherwise deprived of his freedom by the authorities in any significant way" without the warning "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). Absent a *Miranda* warning and a knowing and intelligent waiver of the rights to counsel and to remain silent, "no evidence obtained as a result of interrogation can be used against [a defendant]." *Id.* Volunteered statements, however, are not barred and do not require advice of rights. *United States v. Rommy*, 506 F.3d 108, 132–34 (2d Cir. 2007). For a *Miranda* warning to be required, the defendant must be subject to an interrogation, and the interrogation must have occurred while the defendant was in custody. *United States v. FNU LNU*, 653 F.3d 144, 148 (2d

Cir. 2011); *Rodriguez*, 356 F.3d at 259 (2d Cir. 2004) ("We have said that interrogation, for the purposes of *Miranda,* must reflect a measure of compulsion above and beyond that inherent in custody itself." (citation modified)). Here, the Government does not dispute that Pence was interrogated or that he was not given a *Miranda* warning until after he confessed. Thus, the only issue presented is whether Pence was in custody when he confessed. *See FNU LNU*, 653 F.3d at 148.

"[A]lthough coercive pressure is *Miranda*'s underlying concern, custody remains the touchstone for application of its warning requirement." *United States v. Newton*, 369 F.3d 659, 671 (2d Cir. 2004). This is because "any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *California v. Beheler*, 463 U.S. 1121, 1124 (1983) (citation modified). Law enforcement need only give *Miranda* warnings "where there has been such a restriction on a person's freedom as to render him in custody." *Id.* (citation modified).

When assessing whether a defendant was in custody absent a formal arrest, courts consider the totality of the circumstances and inquire "how a reasonable man in the suspect's position would have understood his situation." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (citation modified). This is "an objective inquiry that asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* (citation modified). An individual who understands his "detention is not likely to be temporary and brief and feels that [he] is completely at the mercy of police could reasonably deem [his] situation comparable" to formal arrest. *Id.* (citation modified).

The Supreme Court has emphasized consideration of "all of the circumstances surrounding the interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270–71 (2011) (citation modified). As a guidepost, however, this Circuit typically begins by considering the following circumstances:

> (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the

- 11 -

suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.

*Faux*, 828 F.3d at 135 (citation modified).

## II.    *Application*

Pence argues that he was in custody at the time of his pre-*Miranda* statements to the FBI agents.[4]  We disagree.

As the district court found, a reasonable person in Pence's circumstances would not have believed he was under formal arrest, not free to leave, or at the mercy of the agents.  Pence entered the FBI vehicle where the interrogation took place under his own will.  This was outside of his home, as his wife, parents, and children went about their day.  He agreed to speak with the agents.  He was never handcuffed.  The agents never pointed their firearms at Pence, and their firearms were holstered during the questioning.  The agents never yelled at or threatened him.  Pence was told that he was not under arrest

---

[4] Pence also argues that, in the alternative, this Court should "retire[]" the reasonable-man standard used in *Miranda* challenges or remand for human-behavior experts to perform the court's burden of assessing and applying the standard.  Appellant's Reply Br. at 1-2; *see also* Appellant's Br. at 26–28.  We reject these arguments because we cannot "retire[]" *Miranda*, and because the question of whether an individual is in custody is a legal one.

and did not have to speak with the agents.  And he never asked to leave or for the questioning to stop.

We held in *Faux* that a two-hour interrogation in the defendant's dining room, after ten to fifteen agents raided her home, did not amount to custody.  828 F.3d at 132 n.2, 138–39.  In doing so, we noted that the defendant was not handcuffed, she was told twenty minutes into the interview that she was not under arrest, the agents did not display their weapons, threaten her, or use physical force, and she did not attempt to end the encounter.  *Id.*  Many of the same circumstances existed here.

Pence argues that, once the interrogation began, a reasonable person would not have felt free to leave considering that he was in an FBI vehicle, outnumbered two to one, and questioned for more than an hour and a half. While the interrogation here, unlike in *Faux*, was not in Pence's home but rather an FBI vehicle outside the home, that is not enough by itself to establish custody, especially given that Pence was given a choice about whether to speak with the agents at all, and whether to do so in his home or in the FBI vehicle outside.  *Cf. United States v. Burke*, 700 F.2d 70, 83–84 (2d Cir. 1983) (finding no custody where defendant voluntarily spoke with agents in an FBI car outside his family home);

- 13 -

*see also United States v. Schaffer*, 851 F.3d 166, 174–76 (2d Cir. 2017) (finding no custody where defendant was questioned in an area adjacent to his office while agents searched his office).

Pence also argues that, at the least, his circumstances are unlike those in *Faux*, and cases like it, because the agents confronted him with evidence of his guilt. Our case law establishes that this factor deserves some weight. *See, e.g., United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969) (Friendly, *J.*) ("The more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers *Miranda*"); *accord, e.g., United States v. Hall*, 459 F.2d 454 (2d Cir. 1972) (per curiam).[5]

---

[5] Other circuits have likewise recognized this as a potentially important factor in assessing whether an interrogation has occurred in a custodial setting. *See, e.g., United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (listing "the extent to which the defendant is confronted with evidence of guilt" as a pertinent factor in assessing whether an interrogation is custodial); *United States v. Panak*, 552 F.3d 462, 469 (6th Cir. 2009) (investigator's knowledge of an individual's guilt is relevant if it is manifested to the individual under interrogation and "would have affected how a reasonable person . . . would perceive his or her freedom to leave") (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)); *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (listing as one of three relevant factors "whether the nature and length of the officers' questioning was accusatory or coercive"); *United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989) (concluding that the fact that the defendant was "confronted with damning evidence of guilt" supported the district court's conclusion that he was in custody).

But this "is simply one circumstance, to be weighed with all the others." *Hall*, 421 F.2d at 545.[6] Here, it does not tip the scale in Pence's favor. Though the officers confronted Pence with potentially incriminating evidence, they did not threaten to arrest him; rather, they emphasized that the focus of their efforts was finding the "people pulling the trigger . . . the big fish. " Dist. Ct. Dkt. 21-6 at 117. In other words, while Pence was "under considerable suspicion," the agents "sedulously abstain[ed] from any threat that they would" arrest him. *Hall*, 421 F.2d at 545–46. None of this should be "significantly colored by what developed later," that is, Pence's confession and arrest. *See id.* at 545.

To be sure, there are circumstances here that support Pence's contention that he was in custody. Pence opened the door of his home to find fourteen law-enforcement agents armed with a mix of equipment and weapons in what he describes as feeling like "Armageddon" at his front door. J. App'x at 143, 178. He was questioned for more than two hours before the agents gave him a *Miranda* warning. While the agents were executing their warrant in the house,

---

[6] *See also United States v. Jabar*, 19 F.4th 66, 74, 83-84 (2d Cir. 2021) (finding no custody in IRS investigation where defendant confessed after agent confronted him with records of certain transactions); *United States v. Badmus*, 325 F.3d 133, 135-36, 138-39 (2d Cir. 2003) (finding no custody where agents confronted defendant with evidence of crime found during search).

before Pence agreed to speak with them outside, he was accompanied by agents as he moved about his house and, at one point, was stopped from going up his stairs. And he was confronted with evidence of his guilt while inside an FBI vehicle. But the district court considered these circumstances together with the evidence discussed above that Pence spoke freely and voluntarily, and concluded, in the totality of circumstances, that a reasonable person would not believe he was at the mercy of the agents, or that his freedom was curtailed to a degree akin to formal arrest. *See Faux*, 828 F.3d at 139. While this case presents a close call, on the facts accepted by the district court and viewing the evidence in the light most favorable to the government, *see Worjloh*, 546 F.3d at 108, we are persuaded that Pence was not in "custody" for purposes of *Miranda*. As the district court emphasized, the agents said to Pence, explicitly, "[y]ou are not under arrest, at all . . . . You're under no obligation to talk to us . . . ." J. App'x at 175.

## CONCLUSION

For the reasons discussed above, the district court's decision is AFFIRMED.

- 16 -